**LAW OFFICE OF SAM A. SCHMIDT**
29 BROADWAY SUITE 1412
NEW YORK, N.Y.  10006
(212) 346-4666
facsimile (212) 346-4668
e-mail lawschmidt@aol.com

Sam A. Schmidt, Esq.
_____

February 19, 2025

Honorable Lewis A Kaplan
United States Courthouse                    **Unredacted and to be Filed**
500 Pearl St.                                **Under Seal**
New York, NY 10007-1312

Re: *United States v. Matthew Queen,*
24 Cr. 291 (LAK)

Dear Honorable Judge Kaplan:

Many decent, caring and hard working people have made mistakes and faced punishment for those mistakes in this building.  They were good to their family, friends and even to their community. Their attorneys were able to demonstrate their positive attributes and good deeds in mitigation. Nevertheless, most earned their punishment which included incarceration for their criminal conduct.

For reasons that I will attempt to demonstrate in this submission, punishment that includes incarceration is not necessary to achieve the purposes found  in 18 U.S.C. § 3553(a) nor as a matter of justice.   Matthew Queen has led a life that has caused  many of his family, friends, colleagues, former students and parishioners to write to Your Honor to describe the man they know and ask for mercy and leniency.[1]

Though lying to a federal officer during an investigation is a serious offense, the Sentencing Guidelines recognize that it is much less serious than most of the offenses that result in prosecutions in this courthouse. Importantly, Matthew

_____

[1] Because of the number of letters being submitted, the letters will be filed as Exhibit A with a table of contents.

Queen never intended to interfere or impact the investigation relating to the allegations of sexual abuse that were alleged to have been committed by a student at Southwestern Baptist Theological Seminary (hereinafter "SWBTS"). Nor did he intend to obstruct the government's subsequent investigation but acknowledges that his conduct, including his falsehood, was wrong and unlawful.

Importantly, the impact of lying was not substantial. The local criminal investigation into the allegations of sexual abuse was not impacted at all. The document prepared by Employee-1 that was a subject of the government investigation and led to Dr. Queen's improper conduct contained no evidence of misconduct on the part of SWBTS or its employees and was not destroyed or hidden. Exhibit B.[2] Also significant was that Matthew Queen quickly acknowledged his falsehood, apologized, repented and truthfully testified in the grand jury. Exhibit C. And while he has not yet been punished by this Court, he has suffered substantially - he needed to resign from his position as lead pastor of his church in North Carolina, and he has been regularly criticized in the religious and secular press with his reputation suffering as a result.[3]

Fortunately, most of those who have had personal interaction with Dr. Queen in the past, as evidenced by the fifty-nine (59) letters, recognize that this man is not characterized solely by his error. Though some have not, most people in his religious community have accepted his repentance and have forgiven his error.

I will be deviating from my normal structure of a sentencing submission. Before I consider the offense of conviction and objections to the Presentence Report ("PSR"), I will discuss Matthew Queen's character and background. While I will summarize some of the content of the fifty-nine (59) letters, I will frequently use the words of those who acknowledge his error but continue to support him and recognize the qualities in him that make him beloved by so many.

---

[2] Though the names of those from SWBTS who have been identified publicly as an "Employee" in documents in this case have been published in various media, Dr. Queen will continue to use "Employee" in this publicly filed submission. Further, pursuant to the Court Order, the documents received from the government will be filed under seal.

[3] Though he was unaware that he was a target of any further investigation, Dr. Queen left his position at SWBTS as a result of the continued tumult that was caused by the earlier investigation.

**Characteristics and Background of Matthew Queen**

Nickie Buckner has been Matthew Queen's friend since sixth grade. Even though he considers himself a non-believer, he recognized Matthew's "unshakeable belief in God" and did not share his friend's ideals and beliefs. What Mr. Buckner appreciates about Matt

> is his authenticity. He genuinely wants to help people regardless of who they are or what they believe. I've met a lot of religious folks growing up in the bible belt, and I can say that most have struck me as judgmental and narrow minded. Salt of the earth folk, but not people inclined to help others that are "different." Matt isn't like that. He wants to help anyone. He doesn't judge or think that he's better than you.

> He doesn't behave differently in public than he does in private. He isn't fake. He isn't preaching the word of God one minute and living high on the hog the next. He isn't putting on airs to impress people. He visits folks in the hospital. He goes to their homes. He shows up for people and tries to do right by them. He isn't one way in the morning and another way in the evening.

Exhibit A15-16.

How Matthew Queen goes out of his way to help others is one of the themes of the letters. David Washer, one of the many former students that became a close friend and colleague, discussed how Matthew Queen advocated and raised money in support of his work in Madagascar and telephoned him to raise his morale. When Mr. Washer needed to return to the United States because of his wife's illness, Matthew was there to help.

> Matt and another pastor organized support for us that provided a completely stocked and furnished house for us the night we returned to the US. We could not believe what they had done for us. I have seen Matt personally give money to church members and students as he heard they were in need. Just last year Matt heard that I was working a side job to earn a little extra money for the

holidays, and he walked up to me and handed me $100.
....

I later discovered that Matt, who was working part time at our church while still working full time at the seminary, selflessly offered to give up his church salary so the church could offer me those funds until I found a new job.

Exhibit A17-18.

Matthew Queen not only assisted those who returned from difficult mission work overseas, he also traveled to do mission work both with students and with parishioners. Dr. Ryan Stokes noted that "I could share for instance how he sacrificed his health to carry out mission work in remote and challenging locations around the world or, closer to home,...." Exhibit A19-20. See also Letter of Laura L. Daily, Exhibit A21-22.

As the letters reflect, as a professor, he was beloved by his students, not simply for his scholarship and inspiration as a lecturer and advisor, but for his dedication, kindness and willingness to help others beyond what is expected of a professor. As Dr. John Massey explained,

Not only did he constantly give of his time to serve students and his colleagues, but he also gave of his own financial resources to help students in need. He has been among the most popular professors in denominational life because of his love for students and accessibility to them at any time. Matt is a selfless individual and has been a credit to the Christian ministry and the denominational community he has served for most of his adult life.

Exhibit A23. Once you met Dr. Queen, whether as a student, colleague or parishioner, he was available to you no matter where you lived. Dr. Teddy Sorrells was grateful for Dr. Queen taking him on as a student even though he already had a full load of doctoral students.

I had navigated a couple of ministry changes in my life, and I had wanted to quit several times. Each time I called Matt up and told him I was quitting; he would stop me. He would pray with me,

encourage me, and refuse to let me quit. He said these four words over and over and I will always be grateful for him, "I believe in you!" One of the greatest highlights of my life was when I walked across the stage to receive my Doctor of Ministry in Preaching degree and stood there while my friend, Matt Queen, "hooded" me. This picture hangs in my office and I recall that day often.

Exhibit A24-26.

Another former student and friend who moved away, Matt Henslee, leaned on Dr. Queen through extremely emotional and psychological times.

Through it all, however, Dr. Queen was a phone call away to pray for me, encourage me, and offer me wisdom or practical steps to deal with what was going on. No longer my professor, no longer paid to be there for me, and yet, he was always a phone call or text away.

Exhibit A27.

Not only have former students and colleagues indicated their love and respect for Dr. Queen, those who worked for him as administrative assistants have the same opinion. When first hired, Hannah LaFavor thought that "[h]e is probably just another professor who has a prominent position and that is why people speak so highly of him." Having worked for him and accompanied him when talking to students, she found that

I could not have been more wrong. From the moment I met Matthew Queen, I was given the honor of seeing how intentional, encouraging, and empathetic he is. Dr. Queen thinks about others before himself always. I have never seen him put the interests of himself above those that need help and love.

Exhibit A28-29.

Of course, Matthew Queen's dedication, devotion and kindness extended to

his role a pastor.  Whether he is visiting those in the hospital,[4] or visiting elderly parents when their children are away, parishioner and friend Sumner Spradling has witnessed Dr. Queen's

> love and concern for others. He treats everyone with warmth and respect, as if they are the most important person he knows, regardless of their background or standing. He is a genuine minister in the truest sense of the word, both in the church and in the community.

Exhibit A30. See also e.g letters of Candice Kislowski, Exhibit A31-32,  Aaron Ledford, Exhibit A33-34,  Susie Piper, Exhibit A35  and other parishioners.

While one expects letters of  support in this situation would express the positive attributes of the defendant, as some of the examples noted above, the letters received have been extraordinary.  Dr. Jon Okinaga, a professor at SWBTS acknowledging  that he has written letters to the court in the past, explains that Matthew Queen is a "rare blend of kindness, generosity and thoughtfulness that sets himself apart." Exhibit A39.   Dr. Travis Kerns, a former professor at SWBTS, writes that

> Having now worked in five different ministry settings around thousands of people across four states, I can say without any doubt Matt stands out as the most humble, sincere, caring, giving, and genuine person I have ever met. He always looks to help others as much as he can without any concern for any personal needs he may have.

Exhibit A40.  Dr. Stokes, another former professor at SWBTS holds Matthew Queen in high esteem.

> Matt holds himself to the highest conceivable moral standards, has an unusually sensitive conscience, and exhibits an overriding

---

[4] Dr. Doris Henderson explained what Dr. Queen did and noted that she visited a lady who had surgery at Duke Hospital in Durham recently. "She told me how Matt was at the hospital before her surgery to pray with her and encourage her family members. She broke down and cried as she was talking. She apologized for crying, but said she felt strongly about how kind Matt was to her, and that it made her cry."  Exhibit A31-33.

concern that he deal with others fairly, compassionately, and honestly. He has shared with me on numerous occasions the anxiety that he experiences as he tries to determine the morally right course of action in a given situation. His friends even tease him for his habit of apologizing to us for giving offense even when no offense has been given. I cannot recall a single time when Matt has wronged me or misled me, though he often worries that he has. If it is possible to be pathologically good, that is what Matt is.

Exhibit A19-20.

Holding Dr. Queen in such great esteem, it is not a surprise that so many of those writing letters were shocked by his misconduct. His former administrative assistant, Jessika Sams, noted that "I have also always admired Matt's desire to do the right thing at both work and in his personal life" and "I have consistently witnessed a desire in Matt to do what is right and to make corrections or amends when a mistake has been made in all areas of his life." Exhibit A41-42.

Though clearly embarrassed and ashamed of his wrongful conduct, the letters make it clear that Dr. Queen has not sought to hide his wrongdoing. He acknowledged and apologized to those he requested to write letters in his support. Mrs. Kislowski was in disbelief but understood that even as a man of integrity, Dr. Queen is human and makes mistakes but "openly acknowledged his mistake and is committed to taking full responsibility." Exhibit A34-35. Mr. Spradling writes that Dr. Queen "has told me personally of his heartfelt remorse and utmost desire to move past this unfortunate mistake and to return to his purpose and calling as a minister." Exhibit A30. Rob Collingsworth, writes that

Although I have limited knowledge of the details surrounding his case, one thing is abundantly clear: Matt has shown extraordinary honesty and remorse. In fact, his sincerity and humility have been so profound that he personally apologized to me, even though his actions did not involve or affect me in any way. This speaks volumes about the depth of his character and his unwavering sense of accountability.

Exhibit A43-44.

Dr. Charles Stewart, an adjunct professor at SWBTS, has a special relationship with Matthew Queen. Dr. Stewart believes that every pastor should have his own pastor and accountability partner. At his request, Dr. Queen served as both for Dr. Stewart, and Dr. Stewart did likewise. As a result,

> Matt was transparent with me as his former accountability partner that he had lied during an interview with the federal investigator. Matt also shared with me that the Lord soon thereafter began to trouble his heart and conscience about this lapse of integrity, the deception of his statement, and the disruption of Matt's treasured relationship with the Lord which his dishonesty had created.

Exhibit A45. Dr. Queen acknowledged his lie to the government agents and is prepared to accept its consequences.

Of course, there are letters from Matthew Queen's family. His father's and brother's letters provide information about Dr. Queen's childhood and relationship, information consistent with his adult life. Exhibit A7-8. His older daughter, ▆▆▆▆▆ demonstrates that no matter how hard he worked, he always made time for his children and set a wonderful example for them. Exhibit A6.

One of the letters that truly stands out in describing Matthew Queen is from Elizabeth Walters, his mother-in-law. Exhibit A9-11. It is impossible to do the letter justice by a brief description. Clearly, other than his wife, Mrs. Walters has the best understanding of who Matthew Queen is, having spent time with him in his home, her home, traveling with him on vacations and service projects, and living with them during serious health issues.

> I have known Matt in the roles of my firstborn daughter's successful suitor, a graduate and post-graduate student, a dynamic preacher, a caring pastor, a devoted husband and father, a lauded seminary professor, a particular and honest scholar, a leader among his peers, a prolific author, an exceptionally hard worker, a generous donor, a sincere friend to all people, and a man who humbly offers his help to struggling men and women of any race, nationality, age, economic or societal status. I have, in fact, seen Matt not only as a professional, a leader in my faith,

> but also as a humble and forgiving man, and a loving and
> caring family member who can be a little mischievous chasing
> me with a lizard.

*Ibid*.  Mrs. Walters discusses his care and concern not only for his family, "[a]s a family man, Matt is a superstar," but also explains what he has done for others beyond his role as professor and pastor.

> He was also the professor who cooked pancakes overnight to
> feed students studying for final exams... His office was also open
> to counsel students. Often when he heard of a student's need for
> food or special medical care, he personally took them to meet
> their needs, often at his own expense.

*Ibid.*

The letter of his wife, Hope Queen, also discusses Dr. Queen's dedication to his faith, his family, his students and everyone with whom he comes in contact. Exhibit A3-5.  Importantly, this letter informs of  the stress and difficulties Dr. Queen faced in 2023 as a result of his new position as provost and the continuing tense atmosphere at SWBTS as a result of the turnover of multiple presidents and provosts**.**  Fear of dismissals was but one cause of the stress.

Mrs. Queen not only gives insight to the difficulties that her husband was facing in early 2023 but also its impact on him.  As a result of the DOJ's subpoena and investigation, Dr. Queen was told by the SWBTS president not to discuss the investigation with anyone else. As Mrs. Queen explains,

> As a result, we did not even tell our extended family. Matt has always
> been an extreme extrovert, and the enforced silence, coupled with
> intimidation, led to a downward spiral in his mental health which was
> fueled by the dysfunctional atmosphere at the seminary. Matt was
> frequently appearing as a guest on podcasts to talk about his book; yet he
> was anxious and scared regarding the investigation. Having been led to
> believe that he would be in legal trouble if he told anyone about the
> investigation and assured that the seminary lawyers represented him,
> Matt sought help from neither a counselor nor an attorney. He had
> questions about the investigation but did not feel the liberty to ask the

seminary's attorneys out of fear of repercussions at work.

Matt's anxiety grew. On a regular basis, I walked into our bedroom and found him on our bed with his chest heaving and limbs shaking. I watched with concern but felt trapped without a way for him to get help due to the instruction not to tell anyone about the investigation.

*Ibid.*

Others recognize what the turmoil at SWBTS did to Dr. Queen. ███████ explained

From 2019-early 2023, our seminary experienced a period marked by significant uncertainty and fear, with many faculty members, myself included, concerned about job security and an unstable environment. These tensions were compounded by a lack of trust in the administration then.
....
It became evident to me that the pressures of his role were taking a toll on him. I recall observing a noticeable change in Dr. Queen's physical appearance as he began losing significant weight. The normally joyful man I had come to know seemed burdened by the weight of responsibilities and stress.

Exhibit █████ filed under seal.

Dr. Queen's kindness, compassion and concern for others sometimes results in difficulties for him.

Matt's deep care for others sometimes makes it difficult for him to make tough decisions, as he loses sleep over them and feels personally devastated for weeks. Unlike some who only care about those who can benefit them, Matt genuinely cares for everyone, including the less fortunate.

Letter of Thomas White, President of Cedarville University.[5]  Exhibit A48-49.

The stress and anxiety brought about by being in a situation completely new to him was too much for Dr. Queen.  As the PSR and Mrs. Queen's letter explain, Dr. Queen contemplated suicide and with Mrs. Queen's persuasion, he  voluntarily sought help at a hospital.  The government was also concerned about Dr. Queen's mental health as a result of its indictment.  It insisted that one of the conditions of his release on bail was for him to obtain the services of a therapist. He did and he continues to see his therapist.

The emotional and psychological consequences, perhaps, are the most severe.   As Mrs. Walters explains

> Matt is sad and beaten down. Even when surrounded by his
> family who loves him, Matt often sits silently with his head
> bowed. Once when I asked him why he was so sad, he said he
> was full of regret.

Exhibit A11.

Mrs. Queen, Mrs. Walters and others have written about the impact that this prosecution has had on Dr. Queen.  Whatever the outcome of this case, hopefully

---

[5]  Statements made by others found in the 3500 material demonstrate the level of anxiety at SWBTS and its impact on Dr. Queen. This included firings by Dr. ▇▇▇▇. 3506-01 p2, Exhibit D, and prior presidents.  In describing Dr. Queen, ▇▇▇▇▇ noted

> Matt is a gem but a people pleasure [*sic*] and he doesn't want to hurt anyone's
> feelings." She went on to explain that during COVID she attempted to contact
> QUEEN via telephone. His assistant advised that he was in a meeting. ▇▇▇▇
> then told the assistant that QUEEN needed to be interrupted immediately.
> ▇▇▇▇ was calling to notify him that someone had tested positive for
> COVID-19 and that he might have been exposed. When QUEEN got on the
> phone with ▇▇▇▇ he immediately asked, "Did I do something wrong? Am I
> in trouble? Am I going to get fired?" ▇▇▇▇ shared that their communication
> went on in a similar way, every time they spoke for a period of approximately
> eighteen (18) months. ▇▇▇▇ felt that many individuals on campus seemed
> afraid from the previous ▇▇▇▇ administration. People could have been fired
> at a moment's notice before.

Exhibit E. ▇▇▇▇

Your Honor will not believe incarceration is necessary and appropriate. Dr. Queen has already suffered severe consequences. Professionally he has been impacted. He was suspended from his position as pastor ultimately leading him to have to resign, had speaking engagements and publications canceled, and was repeatedly denigrated in the secular and Christian press. A number of "friends" have distanced themselves from him. He and his family have been financially impacted.

In his letter, Matthew Queen explains how especially difficult early 2023 was and how it impacted him.

> At the end of a tumultuous five-year period (2018-2023), the president of Southwestern Seminary, ███████████, asked me to serve as the institution's interim provost and vice president for academic administration. I loved Southwestern. In hindsight, however, I was not ready to function well within the dysfunctional dynamics of the time. As the DOJ's investigation unfolded, I felt anxious and overwhelmed. I enjoy working with others in collaboration, but being told that I could not discuss the situation or the accompanying investigation with anyone sent me into a state of anxiety unlike anything I had ever experienced. The isolation and feeling of being unable to trust some colleagues and attorneys led me to make skewed and unwise decisions based on my own reasoning.
>
> Self-doubt, fear, confusion, and uncertainty abounded within me, and I felt lost. I lost about forty pounds and was eating and sleeping very little. Your Honor, I lost a little bit of myself....

Exhibit A1-2.

Matthew Queen is in the process of regaining what he has lost in the past two years. He respectfully requests that Your Honor follow the recommendation of the PSR.

**Comments and Objections to Offense Conduct**

Dr. Queen made a few objections to statements in the PSR not relevant to the offense of conviction but have some relevancy to the background of the investigations. The addendum attempted to summarize the objections and noted the government's and Probation's responses. As a summary, it does not fully reflect some of the objections and did not include that the objections were supported by documents. The documents were received as discovery or 3500 and included statements of other witnesses and will be provided to Your Honor under seal, pursuant to the protective order. The objection letter is attached as Exhibit F.

Mr. Queen has never denied the offense conduct. The objections were not made to minimize or excuse Dr. Queen's conduct but to correct errors as to ancillary facts and to offer further explanations of the events, some that involved Dr. Queen and some that didn't. The objections also demonstrated that Dr. Queen corrected his falsehood on his own and apologized shortly thereafter.

The purpose of the objections to paragraph 9 and part of paragraphs 10 and 11 were to correct the impression that there was misconduct by anyone at SWBTS regarding the investigation into the allegation of sexual abuse by a student. The government's subpoena required the provision of documents regarding sexual abuse and harassment allegations. The police chief received no document. The statement "the Seminary's failure to take action regarding the allegation" implies that the Seminary should have taken some type of action in November 2022 and its failure to do was somehow an effort to cover up or negatively impact the police investigation. This is simply wrong.

The Burleson Police Department did not want any involvement by SWBTS for fear it would interfere with their investigation and alert the suspect who could flee the jurisdiction. The victim and her friend, ███████ were told  conversation that it did not want SWBTS before ███████ spoke with  Employee-1. To a law enforcement professional, such as the Chief of Police at the Seminary,  who was informed that the local police were at the end of their investigation, that a warrant of arrest would be sought soon and the alleged victim was being taken care of, this was obvious. Clearly,  SWBTS should not have interfered with an ongoing investigation nearing completion for it. See ███████ Exhibit G, filed under seal. Importantly, no one at SWBTS interfered with the police investigation.

This objection seeks neither to mitigate nor minimize Dr. Queen's responsibility because it does not relate to any conduct by him. He had no knowledge of the complaint about the student until he learned of the arrest on January 24, 2023. After he learned of the arrest, Dr. Queen participated in the process to uphold the suspension of the alleged offender when he appealed the decision of the Dean of Students.

Dr. Queen also objected to the statement found in paragraphs 10 and 11 that "Employee-2 directed Employee-1 to destroy the document that was produced." The term "destroy" was never used by anyone, and the language used was more ambiguous. Employee-1 told the government in her interview that Employee-2 said "Yeah, can we make this go away." See 3513-01 page 7, Exhibit H. Ms. ▮▮▮▮▮ told the government that Employee-1 told her that " **Employee 2** made a comment in substance to 'I wish that could go away' or 'Wish we didn't have that' and understood **Employee 2** 's comment as an instruction and had forwarded an email or a document to herself and deleted it from SWBTS servers." See ▮▮▮▮▮ ▮▮▮▮▮ Exhibit I.

Thus, no one claims that Employee-2 actually used the term "destroy." While it is clear that Employee-1 may have interpreted it that way, Dr. Queen did not. Even after he remembered more of the conversation between Employee-1 and Employee-2, Dr. Queen did not interpret Employee-2's statement for the document to be destroyed and testified to that under oath. See Exhibit C, grand jury testimony pages 9-10.

Both the PSR and the government also challenged Dr. Queen's statement that he was distracted during the conversation between Employee-1 and Employee-2 about the document. This is not a claim made as a result of the indictment, but one that was made shortly after the event and before there was any investigation. Almost immediately after the February 13, 2024 meeting where the issue was discussed, Employee-1 confirmed that Dr. Queen was on the telephone and was distracted. She told ▮▮▮▮▮ exactly that.

> **Employee 1** also confirmed in her discussion with ▮▮▮▮▮ that QUEEN had been on his phone when she had been in conversation with **Employee 2** in the chapel on 1/26/23. **Employee 1** shared that QUEEN seemed distracted. She recalled that ▮▮▮▮▮ came up and shook QUEEN's hand during the conversation in the chapel.

Exhibit E ███████████. Also shortly after the February 13, 2023 meeting, Dr. Queen told ██████ that though he heard Employee-2 say something, he was distracted Exhibit J, 3510-07 at page 4. In fact, Dr. Queen told ██████ that he felt badly that he was distracted and not paying attention to the conversation between Employee-1 and Employee.[6] ██████ told the government that her "impression was that if QUEEN could not be 100% confident in the exact words that  had used during his conversation with Employee 1, it was not appropriate for him to report it to ██████████."

Additional information that became available during and after the February 13, 2024 meeting at SWBTS increased Dr. Queen's uncertainty of what was said, including statements made by Employee-2. Dr. Queen was told that Employee-2 sent a copy of the document to Dr. ██████ and the attorney for SWBTS. He also learned that Employee-2 previously showed and gave the document to Dr. ██████ on January 26 or 27, 2023, either before or shortly after the January 26, 2023 meeting of Employee-1, Employee-2 and Dr. Queen. Exhibit K, 3506-02 page 6. Clearly, the document was not "destroyed" by Employee-2.

Dr. Queen does not deny that the notes he prepared and was forwarded to the government falsely stated the date it was written. Though it did not include everything he remembered after his May 23, 2023 interview with the government, the contents were accurate. Dr. Queen acknowledged he falsified the date he prepared his notes to the government shortly after he lied about it. He admitted it to counsel. He admitted it in his motion to dismiss. And he admitted it when he pled guilty.

Dr. Queen does not argue or claim that any of the above explanations or objections excuses his conduct of making a false statement to the government. He does not view his uncertainty, anxiety and fears as an excuse for his conduct. He has always believed that lying is wrong and sinful and understands that lying to investigating officials is illegal.

**Conclusion**

Matthew Queen is a good man but not a perfect one. Many of those who

---

[6] Additionally, ██████ told the government that "When ██████ spoke to QUEEN after the prayer in the rotunda, he stated '██████ I just feel so bad. I really wasn't paying attention.' He told ██████ that during the conversation on 1/26/2023 between Employee 1 and Employee 2 he had been on his phone." Exhibit E, ██████████

love and admire him have asked Your Honor not to allow this mistake to define him. As Dr. Kerns states

> Knowing Matt as well as I do, I have no doubt that his error in judgment to which he has admitted does not define him as a person. His sorrow and repentance over that error, and his effort to correct the error, are what define him.

Exhibit A40. Bruce Gale reiterates that this event

> does not reflect his true character. While this incident was unfortunate, I firmly believe it was an anomaly in an otherwise exemplary record of behavior. Throughout our acquaintance, Matt has consistently demonstrated a genuine concern for the well-being of others and has contributed positively to my life and the lives of those around him.

Exhibit A50. See other letters, e.g. by Dr. Abiodun Oluwasogo Adegoke, Exhibit A51; Jimmy Draper ("I would encourage you to consider his stellar reputation and the effective way he has led his life and ministry. My prayer is that you will find his sentencing to be one that reflects his lifetime of effective teaching thousands of students and faithfully caring for his wife in her physical needs and the two daughters who are now remarkable teenagers.") Exhibit A52-23.

In his conversations with those he asked for letters of support, and as often noted in those letters, Matthew Queen has acknowledged his wrongful conduct, his regrets and his repentance. He knows he has disappointed so many, including himself and his faith.

> While I have repented of my sin before God, made it right with the government by correcting my false statement to them, and have pled guilty before this Court, I will forever live with the knowledge that I lied, an action contrary to my faith, my character, and my morals. I am daily reminded that my lie has disappointed my God, my wife, my daughters, my parents, my brothers, my church, my friends, and my students. I fully understand the responsibility I have to respect both law and judicial agents. I commit to you, your Honor, to apply the lessons I have learned from my mistake for the remainder of my life and ministry. I sincerely request your mercy, your Honor, as you decide my sentence.

As others have said, a man should not be judged solely by his error. This is especially true for a man who has spent his life helping others and one that will never make such an error again. There is no identifiable purpose of imposing a period of incarceration for Matthew Queen. There are numerous identifiable reasons not to. I respectfully urge Your Honor to accept the recommendation of the United States Department of Probation and sentence Matthew Queen to one (1) year of probation and a $2,000 fine.

Respectfully submitted,

/s/

Sam A. Schmidt
Attorney for Matthew Queen

# EXHIBIT B

January 25, 2023

*This should be addressed to* ████████

To: **Employee 2**

From: **Employee 1**

RE: ████████ Information Timeline – November 3, 2022.

- On November 3, 2022, I had a phone message from ████████ in reference to a student that was sexually harassed.
- I returned her call that day.
- ████ shared with me the following:
  - She had left a message on the Behavioral Intervention hotline but had not received a call back.
  - After not receiving a call from the BIT representative, she then called me.
  - She is the ████████████ at ████████ Church and was walking wiith a young lady who had filed charges against a student for sexual assault.
  - She wanted us to know that the investigation was concluding and that the detectives had shared with them they were moving to request a warrant be issued.
- I confirmed with ████ that the complaint was in the hands of the Burleson Police Department, that the victim was being cared for and the alleged assault did not happen on campus.
- We exchanged phone numbers should we need to reach each other later.
- I then called Chief ████
  - I relayed the information to him.
  - We discussed a problem with the BIT phone line.
  - I was instructed that since a complaint was not made to the institution, and the student did not live on campus, at this point there was nothing for us to do. It was in the hands of the Burleson Police Department.

MQ0000129

CONFIDENTIAL

# EXHIBIT C

CONFIDENTIAL

1

2

3    UNITED STATES GRAND JURY

4    SOUTHERN DISTRICT OF NEW YORK

5    - - - - - - - - - - - - - - --x
     IN RE:                        :
6
                                   :  August 23, 2022 Additional
7
     SOUTHERN BAPTIST CONVENTION   :
8
     (2022R00674)                  :
9    - - - - - - - - - - - - - -  -x

10                                      United States Courthouse
                                        40 Foley Square
11                                      New York, New York

12                                      June 21, 2023
                                        11:15 a.m.
13

14   A P P E A R A N C E S:

15                          JACQUELINE KELLY
                            Assistant United States Attorney
16
                            LINDSEY KEENAN
17                          Assistant United States Attorney

18

19

20

21

22

23                          Digitally reported by:
                            ANTHONY WESTON
24                          Acting Grand Jury Reporter

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

MQ0000097

1              (Colloquy Precedes)

2              (Witness Enters Room)

3              (Time Noted:  11:48 a.m.)

4    MATTHEW QUEEN called as a witness, having been duly sworn by

5              the Foreperson of the Grand Jury, was examined and

6              testified as follows:

7              FOREPERSON:  Please say your name and spell your

8    name for the record.

9              WITNESS:  My name is Matt Queen.  My legal name is

10   Matthew.  Do I need to do the legal name?

11             FOREPERSON:  Yes, sir.

12             WITNESS:  Okay, I'm sorry, Matthew Queen.  M-a-t-

13   t-h-e-w Q-u-e-e-n.

14             FOREPERSON:  I'll ask that you please keep your

15   voice elevated at all times so that everybody in the room

16   can hear you.

17             WITNESS:  Okay.

18             FOREPERSON:  Thank you.  Please go ahead, AUSA.

19   BY MS. KELLY:

20        Q.   Mr. Queen, have you been subpoenaed to testify

21   here before the grand jury today?

22        A.   Yes.

23        Q.   Do you understand that you've been called by the

24   grand jury to answer questions about their inquiry into

25   possible violations into federal criminal law?

**CONFIDENTIAL**

1          A.   Yes.

2          Q.   This proceeding is being taken down by a court

3     reporter and you are testifying under oath.  Do you

4     understand that?

5          A.   Yes.

6          Q.   Are you on any medication that might hinder your

7     ability to comprehend or answer my questions today?

8          A.   No.

9          Q.   If at any time you want to stop and take a break,

10    please request so from the foreperson.

11         A.   Yes, ma'am.

12         Q.   If at any time you don't understand my questions,

13    please tell me and I will rephrase the question.  Okay?

14         A.   Yes, ma'am.

15         Q.   You have certain rights as a witness before this

16    grand jury and I'm going to advise you of those rights now

17    and confirm that you understand those rights.  Okay?

18         A.   Yes, ma'am.

19         Q.   Do you understand that you have a right not to

20    answer any question that might tend to incriminate you or

21    expose you to criminal liability?

22         A.   Yes, ma'am.

23         Q.   Do you understand that anything you say can be

24    used against you by the grand jury or in a subsequent legal

25    proceeding?

MQ0000099

**CONFIDENTIAL**

1          A.    Yes, ma'am.

2          Q.    Do you understand that you have the right to have

3     a lawyer advise you, not inside this room, but outside the

4     grand jury?

5          A.    Yes, ma'am.

6          Q.    Do you have a lawyer here with you today?

7          A.    Yes.

8          Q.    What is his name?

9          A.    Brian Poe (phonetic sp.).

10         Q.    If at any time during your testimony you wish to

11    step outside to consult with your attorney, please let me

12    know and the grand jury will permit you a reasonable

13    opportunity to do so.  Do you understand that?

14         A.    Yes, ma'am.

15         Q.    It's important to this grand jury that you listen

16    carefully to my questions and you try to answer them as

17    truthfully and as completely as possible.  Do you understand

18    that?

19         A.    Yes, ma'am.

20         Q.    If you should deliberately answer a question

21    untruthfully or incompletely, you may be subject to

22    prosecution for perjury.  Do you understand that?

23         A.    Yes, ma'am.

24         Q.    The Federal Perjury Statute states in essence that

25    if you make a statement under oath to this grand jury and

MQ0000100

CONFIDENTIAL

1   that statement is knowingly false in any material way, then

2   you can be prosecuted for perjury.  Do you understand that?

3       A.   Yes, ma'am.

4       Q.   Also, because this is a federal criminal

5   investigation, the laws concerning obstruction of justice

6   also apply.  Section 1512 of Title 18 of the United States

7   Code provides in essence that anyone who endeavors to impede

8   this grand jury's investigation may be prosecuted for

9   obstruction of justice.  Do you understand that?

10      A.   Yes, ma'am.

11      Q.   The Federal Perjury and Obstruction laws reach

12  evasive or nonresponsive answers in addition to deliberately

13  false answers.  By this, I mean that an answer like I don't

14  know when you do know the answer to the question, but simply

15  don't want to say so, that may be considered a

16  nonresponsive, evasive, or even a false answer.  Do you

17  understand that?

18      A.   Yes, ma'am.

19      Q.   Mr. Queen, where do you work?

20      A.   Southwestern Baptist Theological Seminary.

21      Q.   Where is that located?

22      A.   Ft. Worth, Texas.

23      Q.   How long have you worked at Southwestern Baptist

24  Theological Seminary?

25      A.   Since August of 2010.

MQ0000101

CONFIDENTIAL

1      Q.    Is the Seminary part of the Southern Baptist

2   Convention?

3      A.    Yes, ma'am.

4      Q.    What is your current position at the Seminary?

5      A.    Interim provost and vice president for academic

6   administration and professor of evangelism, LR Scarborough,

7   professor of evangelism, the Chair of Fire.

8      Q.    Who do you report to at the Seminary?

9      A.    ████████████████    the president.

10     Q.    As of January of 2023, were you working as the

11  interim provost?

12     A.    Yes, ma'am.

13     Q.    Did there come a time when you learned that

14  Southwestern had received a grand jury subpoena from the

15  Department of Justice?

16     A.    Yes, ma'am.

17     Q.    What did you understand that subpoena or

18  investigation to relate to?

19     A.    To preserve any documents related to sex abuse --

20  allegations of sex abuse.

21     Q.    So let's break that down.

22     A.    Okay.

23     Q.    What did you understand the subpoena to relate to?

24     A.    Oh, I'm sorry.  Sex abuse in the Southern Baptist

25  Convention.

**CONFIDENTIAL**

1        Q.   And is the Seminary part of the Southern Baptist

2   Convention?

3        A.   Yes, ma'am.

4        Q.   Were you directed to preserve documents and

5   records related to that subpoena?

6        A.   Yes, ma'am.

7        Q.   And were others at the Seminary similarly directed

8   to preserve documents and records related to the subpoena?

9        A.   Yes, ma'am.

10        Q.   Directing your attention to January 2023, did

11   there come a time when you became aware that a Southwestern

12   student had been arrested?

13        A.   Yes.

14        Q.   What was that student's name?

15        A.   ██████████████████

16        Q.   And what was your understanding of why he was

17   arrested?

18        A.   That he had raped ███, I think, ████████████████

19   ██████████████████████████

20        Q.   Did you have any personal relationship with

21   Mr. ████████

22        A.   No, ma'am.

23        Q.   Around that time, in January 2023, did you learn

24   that the victim of the sexual assault had reached out to

25   **Employee 1**   the dean of women, to request a meeting with

MQ0000103

**CONFIDENTIAL**

1    her?

2         A.   Yes, ma'am.

3         Q.   And how did you learn that?

4         A.   She called me on the phone.

5         Q.   Who is she?

6         A.   Who is --

7         Q.   ▐Employee 1▌ called you on the phone?

8         A.   I'm sorry, ▐Employee 1▌ called me on the phone.

9         Q.   Did you meet with ▐Employee 1▌ to discuss the

10   victim's request to meet with her?

11        A.   Yes, ma'am.

12        Q.   When and where did that meeting take place?

13        A.   In MacGorman Chapel at Southwestern Seminary.

14        Q.   When did the meeting take place?

15        A.   January the 26th.

16        Q.   Was anyone else present during the meeting?

17        A.   ▐Employee 2▌

18        Q.   Who is Mr. ▐Employee 2▌?

19        A.   He was the president's chief of staff.

20        Q.   At the Seminary?

21        A.   At the Seminary.

22        Q.   Can you describe your conversation with

23   ▐Employee 1▌ during that meeting?

24        A.   Yes, ma'am.  I came up to her and I told her thank

25   you for meeting with me.  I needed to get some information

MQ0000104

CONFIDENTIAL

1    to answer her question.  I told her that what the president

2    and I had discussed was that if the victim had questions --

3    or had more information about the ███████████ case that

4    she needed to contact the Burleson Police Department

5    directly.  If it related to anything else related to

6    Southwestern Seminary, she needed to meet with the victim.

7    If it was not related to the █████ case, or not related to

8    Southwestern Seminary, it would be her own prerogative

9    whether she would meet with her or not.

10       Q.   And had you discussed this response with

11   Dr.██████ prior to this meeting with **Employee 1**?

12       A.   Yes, ma'am.

13       Q.   And had Dr. ██████ approved this response?

14       A.   Yes, ma'am.

15       Q.   How, if at all, did Mr. **Employee 2** respond to the

16   conversation?

17       A.   He said there was a document that **Employee 1** had

18   provided to him and I said I need to talk to you about the

19   document that you sent to me.  He said that document,

20   there's not a place in the president's office to store or

21   file that, and it needs to go to the Dean of Students

22   office.  He then said this needs to go away.  **Employee 1**

23   then said you have the only printed copy and I still have

24   the original file on my computer.  And he said this

25   conversation never happened.

CONFIDENTIAL

1      Q.   A moment ago you recounted that Mr. Employee 2 said

2  something to the effect of this document needs to go away,

3  correct?

4      A.   Yes, ma'am.

5      Q.   What was his tone at that point in the

6  conversation when he said that?

7      A.   It was stern, but it wasn't -- he didn't raise his

8  voice or anything like that.

9      Q.   Did it sound like he was joking or like he was

10  serious?

11      A.   Serious.

12      Q.   At that time, did you know the specific document

13  to which Mr. Employee 2 was referring?

14      A.   No, ma'am.

15      Q.   Have you seen the document?

16      A.   No, ma'am.

17      Q.   Even sitting here today, have you seen that

18  document?

19      A.   No, ma'am.

20      Q.   Were you fully engaged in the conversation between

21  Mr. Employee 2 and Ms. Employee 1 at that point?

22      A.   No, ma'am.

23      Q.   What were you doing at that time?

24      A.   I was checking my phone for emails and texts.

25      Q.   As you sit here today, do you understand that the

CONFIDENTIAL

1  document they were discussing was within the scope of the

2  Department of Justice subpoena that the Seminary had

3  received?

4       A.   Yes, ma'am.

5       Q.   Mr. Queen, I'm going to ask you at this time to

6  step outside the grand jury room.  You are not excused at

7  this time.  I'm going to consult with the grand jury to see

8  if they have any additional questions for you.

9            MS. KELLY:  So with the Foreperson's permission,

10  I'd ask that the witness step outside.

11            FOREPERSON:  The witness is excused -- thank you.

12            WITNESS:  Thank you.

13            (Witness Excused)

14            (Time Noted:  11:57 a.m.)

15            (Colloquy Follows)

16

17

18

19

20

21

22

23

24

25

MQ0000107

**CONFIDENTIAL**

```
 1                    C E R T I F I C A T E

 2

 3        I, CHRISTY BEHLKE, certify that this is an

 4   accurate transcript of the notes and digital audio recording

 5   by ANTHONY WESTON, Court Reporter, of the testimony taken

 6

 7                           And

 8

 9   the proceedings held in the case of In re: Southern Baptist

10   Convention before the Grand Jury

11

12                          Held in

13

14   United States District Court of the Southern District of

15   New York on June 21, 2023.

16

17

18   August 15, 2023                    _____
     Date                               Christy Behlke
19                                       Transcriber

20

21                                      _____
                                         Anthony Weston
22                                       Official Reporter

23

24

25
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

MQ0000108

CONFIDENTIAL

# EXHIBIT E

Monday. Typically, a group of faculty and staff would go to the campus
rotunda to pray. She ran into QUEEN afterwards. ████ commented "Matt was
freaky and a basketcase since all this came up. Matt is a gem but a people
pleasure and he doesn't want to hurt anyone's feelings." She went on to
explain that during COVID she attempted to contact QUEEN via telephone. His
assistant advised that he was in a meeting. ████ then told the assistant
that QUEEN needed to be interrupted immediately. ████ was calling to notify
him that someone had tested positive for COVID-19 and that he might have
been exposed. When QUEEN got on the phone with ████, he immediately asked,
"Did I do something wrong? Am I in trouble? Am I going to get fired?" ████
shared that their communication went on in a similar way, every time they
spoke for a period of approximately eighteen (18) months. ████ felt that
many individuals on campus seemed afraid from the previous
administration. People could have been fired at a moment's notice before.

When ████ spoke to QUEEN after the prayer in the rotunda, he stated
"████, I just feel so bad. I really wasn't paying attention." He told
████ that during the conversation on 1/26/2023 between Employee 1 and Employee 2
he had been on his phone. ████ indicated that she point blank asked QUEEN,
"Did you hear Employee 2 say anything regarding getting rid of the document
(Employee 1's)" She relayed she specifically asked if he might have or could
have heard something that to that effect. QUEEN responded, "I heard
something, but didn't know what they were talking about." ████ told QUEEN
that he should tell President ██████████████ or let the seminary
legal counsel know.



(About) Employee-1

Employee 1 had informed ████ that ████ had instructed her to send her
timeline of the ████ situation, "up the chain of command" but Employee 1 did
not specify to ████ who specifically she had provided her timeline to.
Employee 1 also confirmed in her discussion with ████ that QUEEN had been on
his phone when she had been in conversation with Employee 2 in the chapel on

1/26/23. █Employee 1█ shared that QUEEN seemed distracted. She recalled that ▮▮▮▮ ▮▮▮▮▮▮ came up and shook QUEEN's hand during the conversation in the chapel.

▮▮▮ did not recall █Employee 1█ raising the issue that ▮▮▮▮▮ had been upset with her for the way she handled the ▮▮▮ matter. She did remember that a day or two after ▮▮▮ had been arrested, ▮▮▮▮▮▮ made a side comment in a meeting with ▮▮▮ and █Employee 3█ about the fact that he had not known about the situation with ▮▮▮ in November of 2022. ▮▮▮ never saw a document that had been drafted by ▮▮▮▮▮ of his concerns on the matter.

# EXHIBIT G

FD-302a (Rev. 5-8-10)

31C-NY-3614336

(U) Interview of ███████████ on
Continuation of FD-302 of 5.22.23 ████████████████████████████ , On 05/22/2023 , Page 3 of 4

████ decided to contact the Dean of Women directly.



██████████ advised that previously in discussions with BPD, law enforcement had made it known that if SWBTS had suspended or expelled ███████, it could interfere with the police investigation. ████ shared that information with Employee 1. Subsequently, ████ and Employee 1 decided that as soon as ████ was notified by BPD that any action by SWBTS would not impede the criminal investigation, ████ would notify Employee 1 immediately. Employee 1 did not mention to ██████ whether or not she or any other SWBTS representative would follow-up with BPD. ████ shared that she never received the green light from BPD to notify SWBTS.

3509-001



EXHIBIT H

asked Employee 2 , "Did you get the document?" referring to the typed timeline that she had dropped off in the President's Office. Employee 1 articulated that Employee 2 responded with the exact words. "Yeah, can we make this go away." Employee 1 told Employee 2 that he possessed the only hard physical copy of the document and offered that she could delete the digital copy from her computer. Employee 2 said, "We are not having this conversation." Employee 1 took Employee 2's response as an acknowledgment that he wanted to go through the course of action that she had proposed and to delete the document.

# EXHIBIT I



██████████ then articulated that she was uncomfortable because of a comment that Employee 2 had made to her. Per Employee 1, Employee 2 made a comment in substance to "I wish that could go away" or "wish we didn't have that" as it related to the communications she possessed. Employee 1 then indicated she understood Employee 2's comment as an instruction and had

forwarded an email or a document to herself and deleted it from SWBTS servers. ████ viewed Employee 1's removal of item(s) from the SWBTS servers as a *deletio*. She felt the item was important because the topic related to sexual abuse/assault.



EXHIBIT J

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████

QUEEN responded, "Yes I was there, at the front of the chapel and people were walking by," He further confirmed that yes he had heard something (said by Employee 2) but that he was distracted. ███████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████.███████'s impression was that if QUEEN could not be 100% confident in the exact words that Employee 2 had used during his conversation with Employee 1, it was not appropriate for him to report it to ██████████ QUEEN confirmed to ██████ that he had heard Employee 2 make a statement to Employee 1 similar to "make this go away."

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████



EXHIBIT K



[handwritten, largely redacted notes]

Dr. Queen; close by but did not participate in conversation / hearing
~~does not recall instructions~~ Queen understood document **Employee 2**
needed to be taken in diff direction; not directly to President/office
└ not used by Queen nor protocol

[3790] (**Employee 1** timeline) — has seen it; saw it the 26th or 27th
**Employee 2** showed it to him; not sure after
meeting w/ Queen + **Employee 1**
— not sure if he saw the addendum
— know of info in addendum; learned victim
attempted to contact _____ **Employee 1 & Employee 2**